UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

THOMAS W.S. RICHEY,

                              Plaintiff,

      v.

LEE STEMLER,

                         Defendant.

Case No. C19-0769-RAJ-MAT

REPORT AND RECOMMENDATION

## INTRODUCTION AND SUMMARY CONCLUSION

This is a civil rights action proceeding under 42 U.S.C. § 1983. Plaintiff Thomas Richey is a state prisoner who is currently confined at the Airway Heights Corrections Center. The claims asserted in this action arise out of events that occurred in early 2019 while plaintiff was confined at the Monroe Correctional Complex ("MCC") - Washington State Reformatory Unit ("WSR"). Plaintiff asserts in this action that defendant Lee Stemler, the Grievance Coordinator at MCC, violated his First Amendment rights to freedom of speech, to petition for redress of grievances, and to be free from retaliation by the manner in which she responded to grievances which she deemed to contain disrespectful language.

The parties have filed cross-motions for summary judgment which are now ripe for review.

REPORT AND RECOMMENDATION
PAGE - 1

The Court, having reviewed plaintiff's complaint, the parties' pending dispositive motions, and the balance of the record, concludes that plaintiff's motion for summary judgment should be granted with respect to his retaliation claim and denied with respect to his freedom of speech and right to petition for redress of grievances claims, that defendant's cross-motion for summary judgment should be granted with respect to plaintiff's freedom of speech and right to petition for redress of grievances claims and denied with respect to his retaliation claim. Plaintiff's complaint and this action should be dismissed with prejudice as to his freedom of speech and right to petition for redress of grievances claims. Plaintiff should be awarded nominal damages only with respect to his retaliation claim.

BACKGROUND

At issue in this action are two grievances plaintiff submitted in April 2019 while he was confined at the MCC, both of which were processed by MCC Grievance Coordinator Lee Stemler, and an infraction report written by Ms. Stemler in May 2019 concerning what she believed to be violations of the Washington Administrative Code ("WAC") in plaintiff's grievance correspondence.

Ms. Stemler has been the grievance coordinator at MCC since December 2015. (Dkt. 13, ¶ 2.) Ms. Stemler's duties as grievance coordinator include processing offender grievances in accordance with the Washington Department of Corrections' ("DOC") grievance policy[1], Offender Grievance Program ("OGP"), and Offender Grievance Program Manual ("OGPM"). (*Id*., ¶ 3.) Ms. Stemler receives offender complaints and processes them from Levels 0 through III. (*Id*.) She investigates some Level I grievances herself and assigns other Level I grievances to

---

[1] *See* DOC Policy 550.100.

REPORT AND RECOMMENDATION
PAGE - 2

the appropriate departments, she assigns Level II grievances to various MCC management staff, and she forwards Level III grievances to DOC Headquarters for investigation and response.  (*Id*.)

On April 26, 2019, Ms. Stemler received an offender complaint, or grievance, from plaintiff in which he complained that on April 13, 2019 a guard entered his cell to do a security check and stepped on his glasses, breaking them (Grievance Log ID 19677663).  (*See id*., ¶ 4 and Ex. 1 at 1.)  Plaintiff claimed in his grievance that he did not know the name of the guard and so "attempted to assist" Ms. Stemler in identifying the guard by describing him as "a sloppy looking geezer who obviously doesn't use deodorant."  (*See id*.; Dkt. 4 at 5, ¶ 3.)  Plaintiff continued as follows: "He has pungent body odor that lingered in my cell after he exited.  I'm sure all the other staff who work with him are well aware of 'stinky' and can assist in identifying him."  (Dkt. 13, ¶ 4 and Ex. 1 at 1.)

Ms. Stemler responded to the grievance on April 29, 2019, directing plaintiff to remove the disrespectful language and requesting that he provide more details regarding his complaint including the officer's name, whether a search report was left, and whether plaintiff had attempted to resolve this issue or informed the sergeant or custody unit supervisor of the issue prior to filing the grievance.  (*See id*.)  Plaintiff was directed to rewrite his grievance supplying the additional information not later than May 6, 2019.  (*Id*.)

Plaintiff submitted a "rewrite" on April 29, 2019, the same day Ms. Stemler provided her response, in which he directed Ms. Stemler to submit the grievance as written.  (*Id*., Ex. 1 at 2.)  Unwilling to simply request that the grievance be filed as written, plaintiff went on to rebuke Ms. Stemler, stating: "I didn't use derogatory language so do your effing job and investigate.  I didn't know his name as I stated, you idiot.  That's why I described him to you."  (*Id*.)  Ms. Stemler responded to plaintiff's rewrite on May 2, 2019, indicating that the grievance had been accepted.

REPORT AND RECOMMENDATION
PAGE - 3

(*Id.*)  That same day, plaintiff submitted a kite withdrawing the grievance.  (*Id.*, Ex. 2.)

Finding it odd that plaintiff was so adamant about having his grievance processed but then requested to withdraw it the same day it was accepted, Ms. Stemler reviewed plaintiff's previous grievance records and located a virtually identical grievance filed by plaintiff in December 2015 while he was confined at the Washington State Penitentiary.  (*See* Dkt. 13, ¶ 5 and Ex. 3.)  Plaintiff had been directed to rewrite that grievance as well to provide a straight-forward statement of concern, omit derogatory and abusive language toward staff, and follow the guidelines set forth in the OGPM.  (*Id.*, Ex. 3.)  Ms. Stemler opines that plaintiff withdrew the grievance at issue in this action to avoid the incident being investigated because it had likely not occurred.[2]  (*Id.*, ¶ 5.)

On May 2, 2019, Ms. Stemler received another grievance from plaintiff, this one complaining about his interaction with a staff member and accusing the staff member, a registered nurse, of lying to him (Grievance Log ID 19677968).  (*Id.*, ¶ 6 and Ex. 4.)  Plaintiff claimed in his grievance that he did not know the name of the nurse and so, once again, "attempted to help" Ms. Stemler in identifying the nurse by describing him as "a fat black dude with a foreign accent so thick, he sounded like he just got off the boat last week."  (*See id.*; Dkt. 4 at 5, ¶ 4.)  Ms. Stemler responded to the grievance on May 3, 2019, directing plaintiff to remove the disrespectful language and noting that plaintiff had been provided the nurse's name in a response to a prior grievance.  (Dkt. 13, ¶ 6 and Ex. 4.)

After receiving Ms. Stemler's response, plaintiff filed a kite complaining about Ms. Stemler's directive.  (*Id.*, Ex. 5.)  Plaintiff stated therein "I'm not using disrespectful language so you just do your job and earn your paycheck by investigating my grievance as written (I don't have

---

[2] Plaintiff has admitted to filing a fabricated grievance in the past (*see* Dkt. 15, Ex. 1 at 2-3) and it would not be unreasonable, in light of the evidence in the record, to assume he had done so again.

REPORT AND RECOMMENDATION
PAGE - 4

log ID #19675524 = as usual, I throw away the drivel you people write in responses)."[3]  (*Id.*, ¶ 6 and Ex. 5.)  Ms. Stemler responded to plaintiff's kite by reminding him that "[a]s explained previously – you cannot appeal or rewrite a complaint on a kite (or kiosk)[.]  Rewrites + appeals must be on a complaint form[.]"  (*Id.*)  Plaintiff did not submit a new complaint form requesting that his grievance be processed and the grievance was therefore administratively withdrawn on May 10, 2019.  (*Id.*, ¶ 6 and Ex. 4.)  On June 5, 2019, after conferring with the Headquarters Grievance Program Manager, Ms. Stemler advised plaintiff that the grievance (Grievance Log ID 19677968), and several others, could still be processed if he chose to proceed.  (*Id.*, ¶ 6.)  Plaintiff declined the offer, advising Ms. Stemler that he had already filed a lawsuit against her.[4]  (*Id.*)

In addition to the two grievances described above, Ms. Stemler, in April 2019, also processed a grievance appeal for yet another of plaintiff's grievances (Grievance Log ID 19675524).  (*Id.*, Ex. 6 at 4.)  In her response to plaintiff's appeal, Ms. Stemler advised plaintiff of deficiencies in the appeal, particularly his reliance on third-party information, and requested that plaintiff rewrite it.  (*Id.*)  Plaintiff, in his purported "rewrite," lambasted Ms. Stemler's response, stating "you're a fucking moron, whomever is answering these grievances.  I <u>can</u> use 3rd party information[.]  File my appeal as written stupid and learn grievance rules – halfwit.  Don't know why the DOC hires lazy fat people."  (*Id.*, Ex. 6 at 5.)  Ms. Stemler responded by advising that plaintiff's original appeal would be accepted while also noting that the rewrite had nothing to do

---

[3]  The Court notes that while plaintiff claimed not to know the name of the nurse, he referred to the same nurse by name in a grievance appeal of a separate grievance submitted only five days before the grievance at issue here.  (*See* Dkt. 13, Ex. 4 and Ex. 6 at 4.)

[4]  Though plaintiff submitted his complaint in this action to the Court for filing on May 21, 2019, the Court did not Order service of the complaint on Ms. Stemler until July 16, 2019.  (*See* Dkt. 1, 5.)  It therefore seems unlikely that Ms. Stemler would have been aware of the lawsuit at the time she advised plaintiff he would be permitted to proceed with his grievances.

REPORT AND RECOMMENDATION
PAGE - 5

with his complaint and was disrespectful.  (*Id*.)

On May 6, 2019, Ms. Stemler submitted an initial serious infraction report to the MCC disciplinary unit together with copies of grievances in which she believed plaintiff had violated WAC 137-28-220(103) for failing to follow orders, rules, or policies not otherwise included in the WACs, and WAC 137-28-030(896) for "[h]arassing, using abusive language, or engaging in other offensive behavior directed to or in the presence of another person(s) or group(s) based upon race, creed, color, age, sex, national origin, religion, sexual orientation, marital status or status as a state registered domestic partner, disability, veteran's status, or genetic information."  (*Id*., ¶ 7 and Ex. 7.)  Ms. Stemler, in her infraction report, cited the two grievances and the grievance appeal discussed above.  (*Id*., Ex. 7.)

According to Ms. Stemler, she filed this initial infraction report because she believed plaintiff had abused the grievance system to harass others.  (*Id*., ¶ 7.)  Ms. Stemler notes that plaintiff submitted grievances that were deficient in various ways and seemed to focus primarily on demeaning staff members rather than attempting to present an actual problem for resolution. (*Id*.)  Ms. Stemler states that in writing the initial infraction report, she was simply trying to uphold the legitimate penological interests underlying the WACS—namely, institutional order, safety and security, and respectful communication, including respect for individuals of other races and national origins.  (*Id*.)  Ms. Stemler maintains that she did not realize at the time she wrote the initial infraction report that the WACs do not apply in this context to grievances.[5]

Following a hearing on the infractions identified in Ms. Stemler's report, plaintiff was

---

[5] In July 2019, Ms. Stemler filed another initial serious infraction report against plaintiff, again based on harassing and abusive language contained in his grievances.  (*See* Dkt. 18, Ex. 6.)  That infraction is not at issue in this action.

REPORT AND RECOMMENDATION
PAGE - 6

found guilty of a "reduced 202 general infraction"[6] and was sanctioned with only a reprimand and a warning. (*See* Dkt. 14, ¶ 3 and Ex. 1.) Plaintiff appealed the guilty finding and on June 19, 2019 MCC Associate Superintendent Michele Wood dismissed the infraction. (*See id*.) The infraction no longer appears on plaintiff's institutional record. (*Id*.; Dkt. 13, ¶ 7 and Ex. 8.)

In early May 2019, prior to filing this action, plaintiff, in his non-legal outgoing correspondence, boasted to his wife and others about how he had engineered this and other lawsuits in search of "a nice payday." (*See* Dkt. 15, Ex. 1.) Plaintiff also, on multiple occasions, expressed his delight at having been infracted by Ms. Stemler. In a letter dated May 9, 2019, plaintiff wrote the following to his wife:

> You know why I received an infraction. This is a great outcome. I thought it was something serious. You simply have no idea how good this is. . . . I know exactly what the rules of the game are and how to play them. This situation is laughable. I'm enjoying myself immensely. I'm aware of the big picture. . . . I'm about to win my case as soon as the US Supreme Court denies review. This means I have a limited period of time in which to get them for using free speech in my grievances. As soon as the Supreme Court denies review, they'll close the door on dismissing grievances for disagreeable language. So I'm trying to get as many grievances as possible dismissed before they stop dismissing them.

(*Id*., Ex. 1 at 13-14.) Plaintiff went on to state "if I go in and don't fight this, I can sue her for more than simply dismissing my grievances on the basis of language, I can also sue her for retaliation . . . I know the game I'm playing." (*Id*., Ex. 1 at 14.)

A couple of days later, plaintiff wrote to his wife, "Perhaps now you understand my delight and jubilation over the infraction? I could easily march into the hearing and get the infraction quashed. But I won't. I'll let it play out because it's in my best interest to be proved guilty and punished . . . EASY lawsuit to win. Absolutely <u>EASY</u>. They essentially just piled thousands of

---

[6] Under WAC 137-28-220(202), "Harassing, using abusive language, or engaging in other offensive behavior directed to or in the presence of another person(s) or group(s)" constitutes a general infraction.

REPORT AND RECOMMENDATION
PAGE - 7

1    dollars onto a silver platter and handed it to us." (*Id.*, Ex. 1 at 6-7.)

2        In a subsequent letter, plaintiff shared with his wife the news of having prevailed on another

3    of his cases, *Richey v. Dahne*, in the United States Supreme Court:

4        I'm quite proud of this achievement. The highest court in the US drafted an opinion
         that favored my argument. I've come a long way baby. And just remember, this

5        lawsuit was a creation of a set up. I had the idea to do it based on an old case law
         and made the content of the grievance up. There never was an "extremely obese

6        female Hispanic guard" who denied me a shower. All fabricated. And it made it
         all the way to the US Supreme Court. Amazing.

7

8    (*Id.*, Ex. 1 at 2-3.) Plaintiff went on to express again his delight at having been infracted: "That's

9    another lawsuit and settlement pending. So glad I made the effort to push forward with these

10   additional grievances. It's additional cash in our pockets." (*Id.*, Ex. 1 at 3.)

11       In yet another missive, to someone other than his wife this time, plaintiff again expressed

12   his glee over having been infracted: "Received another infraction. Normally I wouldn't be happy

13   but this is brilliant. They infracted me for using disrespectful language in grievances! Yes! More

14   lawsuits. More money!" (*Id.*, Ex. 1 at 18.) He continued, "they resorted to retaliating against me

15   by infracting me. This is hillarious!" (*Id.*) Finally, he wrote "I've been submitting as many

16   grievances as possible in an effort to see them dismissed so I can sue. . . . This is really a money-

17   making opportunity." (*Id.*)

18       Despite plaintiff's view of the OGP as simply a money-making venture, the actual point of

19   the program is to promote effective communication between staff and prisoners and to resolve

20   actual conflicts and grievances. (Dkt. 13, ¶ 8.) Ms. Stemler explains that the use of disrespectful

21   language in grievances detracts from the grievance program, but it ultimately does not preclude a

22   grievance from being processed. (*Id.*) If a prisoner is asked once to remove disrespectful language

23   from his grievance, and refuses to do so using the proper procedure, the grievance will still be

REPORT AND RECOMMENDATION
PAGE - 8

1  processed.  (*Id.*)

2        Plaintiff asserts in his complaint that Ms. Stemler violated his First Amendment right to

3  freedom of speech when she ordered him to censor protected language contained in his grievances.

4  (Dkt. 4 at 6, ¶ 7.)  He further asserts that Ms. Stemler violated his First Amendment right to petition

5  for redress of grievances when she dismissed Grievance Log ID 19677968 based on plaintiff's

6  refusal to remove disrespectful language.  (*Id.*)  Finally, plaintiff asserts that Ms. Stemler retaliated

7  against him when she filed a serious infraction report based on the disrespectful language

8  contained in his grievances.  (*Id.*)  Plaintiff now seeks summary judgment with respect to each of

9  his asserted claims.  (Dkt. 10.)  Defendants oppose plaintiff's motion for summary judgment and

10 themselves seek summary judgment with respect to each of plaintiff's asserted claims.  (Dkt. 12.)

DISCUSSION

Summary Judgment Standard

13       Summary judgment is appropriate when a "movant shows that there is no genuine dispute

14 as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

15 56(a).  The moving party is entitled to judgment as a matter of law when the nonmoving party fails

16 to make a sufficient showing on an essential element of his case with respect to which he has the

17 burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The moving party bears

18 the initial burden of showing the district court "that there is an absence of evidence to support the

19 nonmoving party's case."  *Id*. at 325.  The moving party can carry its initial burden by producing

20 affirmative evidence that negates an essential element of the nonmovant's case, or by establishing

21 that the nonmovant lacks the quantum of evidence needed to satisfy its burden of persuasion at

22 trial.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc*., 210 F.3d 1099, 1102 (9th Cir. 2000).

23 The burden then shifts to the nonmoving party to establish a genuine issue of material fact.

REPORT AND RECOMMENDATION
PAGE - 9

1    *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must

2    draw all reasonable inferences in favor of the nonmoving party. *Id*. at 585-87.

3        In supporting a factual position, a party must "cit[e] to particular parts of materials in the

4    record . . .; or show[] that the materials cited do not establish the absence or presence of a genuine

5    dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R.

6    Civ. P. 56(c)(1). The nonmoving party "must do more than simply show that there is some

7    metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 585. "[T]he

8    requirement is that there be no *genuine* issue of material fact. . . . Only disputes over facts that

9    might affect the outcome of the suit under the governing law will properly preclude the entry of

10   summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in

11   original). The central issue is "whether the evidence presents a sufficient disagreement to require

12   submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

13   *Id*. at 251-52.

14       The opposing party must present significant and probative evidence to support its claim or

15   defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991).

16   "The mere existence of a scintilla of evidence in support of the non-moving party's position is not

17   sufficient[]" to defeat summary judgment. *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216,

18   1221 (9th Cir. 1995). Nor can the nonmoving party "defeat summary judgment with allegations

19   in the complaint, or with unsupported conjecture or conclusory statements." *Hernandez v.

20   Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).

21   <u>Section 1983 Standard</u>

22       In order to sustain a civil rights action, a plaintiff must show (1) that he suffered a violation

23   of rights protected by the Constitution or created by federal statute, and (2) that the violation was

REPORT AND RECOMMENDATION
PAGE - 10

1    proximately caused by a person acting under color of state or federal law. *See Crumpton v. Gates*,

2    947 F.2d 1418, 1420 (9th Cir. 1991).  To satisfy the second prong, a plaintiff must allege facts

3    showing how individually named defendants caused, or personally participated in causing, the

4    harm alleged in the complaint. *See Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981).  The

5    causation requirement of § 1983 is satisfied only if a plaintiff demonstrates that a defendant did an

6    affirmative act, participated in another's affirmative act, or omitted to perform an act which he was

7    legally required to do that caused the complained of deprivation. *Id*. (citing *Johnson v. Duffy*, 588

8    F.2d 740, 743-44 (9th Cir. 1978)).

9                                   First Amendment:  Grievances

10    Plaintiff asserts that Ms. Stemler violated his First Amendment rights when she ordered

11    him to censor his protected language in two grievances he submitted in late April 2019, and when

12    she dismissed one of those grievances because of his refusal to remove disrespectful language.

13    (Dkt. 4 at 6.)

14        *1.    Grievance Log ID 19677663*

15    The first grievance at issue is that assigned Grievance Log ID 19677663 in which plaintiff

16    complained that a guard had stepped on and broken his glasses during a security check.  Plaintiff

17    wrote therein: "I don't know the name of the guard, but he's a sloppy looking geezer who obviously

18    doesn't use deodorant.  He has pungent body odor that lingered in my cell after he exited.  I'm

19    sure all the other staff who work with him are well aware of 'stinky' and can assist in identifying

20    him." (Dkt. 13, ¶ 4 and Ex. 1 at 1.)  Ms. Stemler directed plaintiff to rewrite the grievance to both

21    remove the disrespectful language and to provide more details regarding his complaint.  (*See id*.)

22    Plaintiff, in turn, filed a "rewrite" on an offender complaint form in which he directed Ms. Stemler

23    to submit the grievance as written, and Ms. Stemler accepted the grievance.  (*Id*., Ex. 1 at 2.)

REPORT AND RECOMMENDATION
PAGE - 11

Plaintiff thereafter requested that the grievance be withdrawn. (*See id.*, Ex. 1 at 2 and Ex. 2.)

The Ninth Circuit has held that "disrespectful language in a prisoner's grievance is . . . protected activity under the First Amendment." *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009) (citing *Bradley v. Hall*, 64 F.3d 1276, 1281–82 (9th Cir. 1995)). However, the Ninth Circuit has also made clear that a mere request from a prison official that a prisoner rewrite a grievance to remove disrespectful language does not constitute a First Amendment violation. *Richey v. Dahne*, 733 Fed. Appx. 881, 883 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 1531 (2019) ("The prison could and did have valid grounds to make such a request in the interest of maintaining good relations between prisoners and guards."). In *Richey v. Dahne*, the Ninth Circuit concluded that the First Amendment violation occurred only when the grievance was not allowed to proceed through the administrative process after Mr. Richey, the plaintiff there and here, refused to rewrite it to remove language the grievance coordinator found objectionable. *Id.* In this case, the evidence makes clear that Grievance Log ID 19677663 was allowed to proceed after plaintiff refused to rewrite it to remove the disrespectful language. Thus, no First Amendment violation occurred.

### 2.    Grievance Log ID 19677968

The second grievance at issue is that assigned Grievance Log ID 19677968 in which plaintiff complained that a staff member had lied to him. Plaintiff wrote therein: "I want to grieve the liar who interviewed me in front of my cell on 4-16-19. . . . I don't know his name, but he was a fat black dude with a foreign accent so thick, he sounded like he just got off the boat last week. He's a registered nurse I believe." (Dkt. 13, Ex. 4.) Ms. Stemler, in response to the grievance, directed plaintiff to remove the disrespectful language and noted that plaintiff had been provided the nurse's name in a response to a prior grievance. (*Id.*)

Rather than submit a "rewrite" of his grievance on an offender complaint form as he had

REPORT AND RECOMMENDATION
PAGE - 12

done with the grievance discussed above, plaintiff instead filed a kite in which he asserted that he was not using disrespectful language and instructed Ms. Stemler to "just do your job and earn your paycheck by investigating my grievance as written." (*Id.*, Ex. 5.) Ms. Stemler responded to the kite by reminding plaintiff that he could not appeal or rewrite a complaint on a kite but, instead, had to do so on a complaint form. (*Id.*) Plaintiff did not submit a new complaint form requesting that his grievance be processed and the grievance was therefore administratively withdrawn on May 10, 2019. (*See id.*, Ex. 4.)

Plaintiff argues that the grievance was improperly dismissed on the grounds that he refused to rewrite it to remove the language Ms. Stemler found to be disrespectful. (Dkt. 10 at 2-3.) Ms. Stemler argues that it was plaintiff's failure to follow the procedural rules that caused the grievance to be closed and not his failure to remove the disrespectful language. (Dkt. 12 at 11.) Ms. Stemler also notes that plaintiff was subsequently given an opportunity to proceed with the grievance, but he declined.[7] (*Id.* at 12.)

Plaintiff claims that he followed proper procedure by sending Ms. Stemler a kite insisting that she accept the grievance as written and he maintains that he had used the same procedure on multiple other occasions. (Dkt. 18 at 4.) However, the evidence submitted by plaintiff in support of these assertions reveals that the times he was permitted to use a different procedure were times during which he was confined at a different facility, the Washington State Penitentiary, and not at MCC. (*Id.*, Ex. 3.) It is apparent from Ms. Stemler's response to plaintiff's kite that she had

---

[7] In declining the offer to have the grievance processed, plaintiff advised Ms. Stemler that he had already filed a lawsuit against her. (Dkt. 13, ¶ 6.) However, the substance of the grievance is not in any way a part of this lawsuit. It is unclear why plaintiff would decline to have the grievance processed for purposes of resolving the substantive issue raised therein unless resolution of the substantive issue was not the point of filing the grievance in the first instance. The letters written by plaintiff to his wife and others suggest that plaintiff's primary motivation in filing the grievances was to have them dismissed so that he could file lawsuits and obtain cash settlements. (*See* Dkt. 15, Ex. 1.)

REPORT AND RECOMMENDATION
PAGE - 13

previously advised him of the requirement that he submit any rewrite or appeal on an offender complaint form. (*See* Dkt. 13, Ex. 5.) Plaintiff, for reasons known only to him, elected not to do so in this instance even though he had followed the correct procedure with respect to his prior grievance. In any event, the evidence in the record does not, as plaintiff insists, demonstrate that his grievance was dismissed based upon its content. Rather, the evidence demonstrates that the grievance was withdrawn based on plaintiff's failure to comply with procedural rules of which he had notice.[8] Plaintiff therefore fails to demonstrate any violation of his First Amendment rights related to Grievance Log ID 19677968.[9]

First Amendment: Infraction

Plaintiff also asserts that Ms. Stemler retaliated against him, in violation of his rights under the First Amendment, when she infracted him based on disrespectful language contained in his grievance materials. (Dkt. 4 at 6.) A viable claim of First Amendment retaliation within the prison context has five basic elements: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005).

---

[8] Plaintiff's argument that Ms. Stemler did not provide any citation for the rule in question is irrelevant. Plaintiff was on notice of the procedural rule, and could have easily complied, but chose not to do so.

[9] Plaintiff also complains, in relation to the second grievance at issue here, that though he was supposed to have until May 10, 2019 to comply with the directive that he rewrite the grievance, Ms. Stemler actually dismissed the grievance on May 3, 2019, the same day plaintiff sent his kite to Ms. Stemler directing her to investigate the grievance as written. (Dkt. 18 at 5.) Plaintiff does not identify any evidence which supports this claim and it is not at all clear how plaintiff reached this conclusion. In any event, the evidence in the record demonstrates that plaintiff's grievance was withdrawn on May 10, 2019 when he failed to submit a proper rewrite. (*See* Dkt. 13, Ex. 4.) The Court can't help but note that plaintiff could have effectively resolved any genuine concerns about the alleged premature withdrawal of his grievance by accepting Ms. Stemler's subsequent offer to reinstate the grievance.

REPORT AND RECOMMENDATION
PAGE - 14

Plaintiff asserts that Ms. Stemler sought to punish him by writing a serious infraction report against him based on the content of his grievances. (Dkt. 10 at 4 and Ex. 5.) Plaintiff maintains that Ms. Stemler's actions were contrary to the OGPM which provides that prisoners can only be infracted for filing malicious complaints or threatening grievances, and he argues that Ms. Stemler knew, or should have known, that she could not take such adverse action against him. (*Id.* at 4.) Plaintiff further argues that because Ms. Stemler was prohibited from infracting him, but did so anyway, her actions evidence a clear case of retaliation. (*Id.* at 5.)

Ms. Stemler concedes that under Ninth Circuit precedent an adverse action undertaken in response to an inmate's disrespectful language in a grievance constitutes retaliation. (Dkt. 12 at 12-13 (citing *Brodheim*, 584 F.3d at 1271).) She asserts, however, that her actions were motivated by her overall concern about plaintiff's abuse of the grievance system, and she argues that her attempt to curb plaintiff's abuse was an effort to uphold the legitimate penological interests of institutional order, safety and security, respectful communication, and respectful conduct towards individuals of other races and national origins. (*See id.* at 13; Dkt. 19 at 3.) Ms. Stemler further argues that because plaintiff's infraction was ultimately dismissed, he received no real sanction as a result of the infraction and, thus, there was no chilling effect nor any other harm suffered by him. (*See id.*)

There is no question that Ms. Stemler's submission of a serious infraction report based on plaintiff's use of disrespectful language in his grievance materials constituted adverse action related to plaintiff's protected conduct. At issue is whether, as Ms. Stemler argues, there was an absence of any chilling effect on plaintiff as a result of the infraction and whether her decision to infract plaintiff reasonably advanced legitimate correctional goals.

The Ninth Circuit has held that an objective standard governs the chilling inquiry.

REPORT AND RECOMMENDATION
PAGE - 15

*Brodheim*, 584 F.3d at 1271 (citing *Rhodes*, 408 F.3d at 568-69). Thus, "a plaintiff does not have to show that his speech was actually inhibited or suppressed, but rather that the adverse action at issue would chill or silence a person of ordinary firmness from future First Amendment activities." *Id*. (internal quotations and citations omitted). The Ninth Circuit has explained that "[t]o hold otherwise would be unjust as it would allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity." *Id*. (internal quotations and citation omitted).

Ms. Stemler maintains that it is not the practice of the DOC to infract incarcerated individuals for disrespectful language in their grievances and that plaintiff was aware of this fact and knew his infraction would not be upheld. (*See* Dkt. 12 at 13; Dkt. 14, ¶ 3.) Ms. Stemler goes on to argue that receiving an infraction which plaintiff knew was not in line with the typical practice or rules of the DOC and would be dismissed would not chill a reasonable inmate of ordinary firmness. (Dkt. 12 at 13.) Ms. Stemler notes that plaintiff was actually "quite delighted" about having received the infraction because he believed he could leverage it into a profitable lawsuit and knew the infraction would not be upheld. (*See id*.; *see also* Dkt. 19 at 3.)

There is, in fact, no evidence in the record that plaintiff's rights were actually chilled by Ms. Stemler's actions and the weight of the evidence suggests that, indeed, those actions were welcomed by plaintiff. However, leaving aside plaintiff's unique characteristics and motivations, and applying the objective standard mandated by the Ninth Circuit, this Court must conclude that a reasonable person may well have been chilled by a serious infraction report such as that written by Ms. Stemler.

To the extent Ms. Stemler argues that infracting plaintiff based on the disrespectful language contained in his grievance materials reasonably advanced legitimate corrections goals,

REPORT AND RECOMMENDATION
PAGE - 16

her argument is foreclosed by established Ninth Circuit precedent.  *See Brodheim*, 584 F.3d at 1272-73; *Bradley*, 64 F.3d at 1281.  In sum, the evidence in the record demonstrates that Ms. Stemler violated plaintiff's First Amendment right to be free from retaliation when she infracted plaintiff based on the disrespectful language contained in his grievance materials.

<u>Qualified Immunity</u>

Ms. Stemler next argues that she is entitled to qualified immunity in this action.  (*See* Dkt. 12 at 13-15.)  Qualified immunity protects § 1983 defendants from liability for civil damages so long as their conduct does not violate clearly established constitutional or statutory rights of which a reasonable person would have known.  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.'"  *Ashroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

In *Saucier v. Katz*, 533 U.S. 194, 201 (2001), the Supreme Court set forth a two-prong test to be applied in evaluating claims of qualified immunity:  (1) whether the facts alleged, when taken in the light most favorable to the party asserting the injury, show that the defendant's conduct violated a constitutional right; and (2) whether the right was clearly established.  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Id*. at 202.

As explained above, with respect to plaintiff's claims regarding Ms. Stemler's directive that he remove disrespectful language from his grievances, plaintiff has not established any violation of his First Amendment rights.  The Court therefore need not consider the second prong

REPORT AND RECOMMENDATION
PAGE - 17

of the *Saucier* test with respect to those claims.  Plaintiff has, however, established a violation of his constitutional rights relating to the initial infraction report written by Ms. Stemler based on the disrespectful language contained in plaintiff's grievance materials.  The Court must therefore address the second prong of the *Saucier* test with respect to plaintiff's retaliation claim; *i.e.*, was the right clearly established.

Ms. Stemler acknowledges in her summary judgment motion that if the Court were to find a constitutional violation in relation to the infraction report, it would likely rely on the Ninth Circuit's decision in *Richey v. Dahne*, 733 Fed. Appx. 881, to find the right clearly established. (Dkt. 12 at 14.)  Ms. Stemler asserts, however, that under the proper constitutional analysis, the right should not be deemed clearly established because of the overwhelming precedent from other circuits holding that disrespectful language in grievances is not protected.[10] (*Id*.)  It appears that the Ninth Circuit may well be an outlier in holding that disrespectful language in grievances constitutes protected speech and that a prisoner may not be punished for it.  (*See* Dkt. 12 at 13 n.2.)  However, the law in the Ninth Circuit *is* clearly established and, importantly, the Ninth Circuit has spoken directly on such issues in another case filed by plaintiff involving other DOC staff members.  *See Brodheim, supra; Richey v. Dahne, supra*.  Ms. Stemler should have known that writing an infraction against plaintiff based upon disrespectful language contained within his grievance materials was unlawful and she is therefore not entitled to qualified immunity with respect to plaintiff's retaliation claim.

<u>Relief</u>

The Court, having concluded that Ms. Stemler violated plaintiff's First Amendment rights

---

[10] Ms. Stemler makes clear in her motion papers that she is asserting this argument in order to preserve it.

REPORT AND RECOMMENDATION
PAGE - 18

1    by infracting him based on the content of his grievances, turns now to her argument that plaintiff

2    is not entitled to punitive or compensatory damages in this action.  (*See* Dkt. 12 at 15.)  Plaintiff,

3    in his complaint, specifically requests punitive damages and "recompensation for filing fees and

4    costs." (Dkt. 4 at 8.)  Plaintiff also requests that the Court "award any other damages it deems

5    appropriate." (*Id*.)  Plaintiff makes no reference to compensatory damages and, in his response to

6    Ms. Stemler's cross-motion for summary judgment, plaintiff argues only that he is entitled to

7    punitive damages.  (*See* Dkt. 18 at 9-10.)  The Court therefore considers only plaintiff's request

8    for punitive damages.

9        Punitive damages serve to punish a defendant for wrongful conduct and to deter the

10   defendant and others from repeating that wrong.  *Dang v. Cross*, 422 F.3d 800, 810 (9th Cir. 2005).

11   Punitive damages are available in cases brought under § 1983 only when a plaintiff demonstrates

12   that a defendant's conduct was driven by evil motive or intent, or when it involved reckless or

13   callous indifference to the constitutional rights of others.  *Id*. at 807.  Oppressive conduct is also a

14   proper predicate for an award of punitive damages under § 1983.  *Id*. at 808.

15       "Conduct is malicious if it is accompanied by ill will, or spite, or if it is for the purpose of

16   injuring another.  Conduct is in reckless disregard of the plaintiff's rights if, under the

17   circumstances, it reflects complete indifference to the plaintiff's safety, rights, or the defendant

18   acts in the face of a perceived risk that its actions will violate the plaintiff's rights under federal

19   law." *Id*. at 807 (quoting 9th Cir. Model Civ. Jury Instr. 7.5 (2004)).  Conduct is oppressive "if

20   done in a manner which injures or damages or otherwise violates the rights of another person with

21   unnecessary harshness or severity as by misuse or abuse of authority or power or by taking

22   advantage of some weakness or disability or the misfortunes of another person." *Id*. at 809.

23       "A section 1983 punitive damages claim is subject to summary adjudication 'where

REPORT AND RECOMMENDATION
PAGE - 19

plaintiff fails to produce evidence raising a material question of fact regarding aggravating circumstances or the reckless or callous nature of defendant's actions.'" *Mergargee v. Wittman*, 550 F. Supp. 2d 1190, 1214 (E.D. Cal. 2008) (citing *Kyle v. Patterson*, 196 F.3d 695, 698 (7th Cir. 1999)). Ms. Stemler argues there is no way plaintiff can make the requisite showing as to punitive damages. (Dkt. 12 at 15.) She asserts that the evidence in the record shows she wrote the serious infraction report based on a misunderstanding of the Washington Administrative Code's application to grievances, and based on the intention of promoting safety and respectful conflict resolution. (*Id.*; Dkt. 13, ¶ 7.) Ms. Stemler maintains that this cannot be construed as an evil motive, and she argues there is no evidence she acted with malice or callous indifference to plaintiff's rights. (Dkt. 12 at 15.) She claims that now that she has learned this type of infraction is not allowed, she will not write another one. (*Id.*; Dkt. 13, ¶ 7.)

Plaintiff maintains that punitive damages are warranted in this case. (*See* Dkt. 18 at 9-10.) He cites to his long history of being denied his First Amendment rights by Washington DOC staff members and asserts that Ms. Stemler, among the many DOC employees who have allegedly violated his rights, is "the worst violator of all." (*Id.* at 9.) Plaintiff claims that Ms. Stemler not only dismissed many of his grievances, beyond those at issue in this case, she also maliciously initiated infractions against him with the intent to punish him for exercising his First Amendment rights. (*Id.*) Because plaintiff has established a violation of his constitutional rights arising only out of the infraction initiated by Ms. Stemler in May 2019, the punitive damages discussion will be limited to that specific conduct.

Plaintiff argues that Ms. Stemler's concessions in her motion papers that she knew the Ninth Circuit had held that adverse action in response to the content of a prisoner's grievances constituted retaliation, and that she was familiar with the OGPM which prohibits DOC staff from

infracting a prisoner based on the written content of the prisoner's grievances, in combination with the fact that she infracted plaintiff twice for the same thing, undermines her claim that she misunderstood what she was doing and had learned from the experience.  (*Id*. at 9-10.)

As explained above, it is certainly true that Ms. Stemler *should* have known that initiating an infraction against plaintiff based on the content of his grievances was not permissible. However, there is no evidence whatsoever to undermine Ms. Stemler's assertion that she simply misunderstood the interplay between the OGPM and the WACs, and the fact that the WACs did not apply in the context of grievances.  Plaintiff makes much of the fact that Ms. Stemler infracted him a second time in July 2019 for the same impermissible reason she infracted him in May 2019, after the original fraction had already been dismissed.  (*See* Dkt. 18 at 8, 10.)  However, there is no evidence that Ms. Stemler knew the original infraction had been dismissed or, in any event, was aware of the reason for the dismissal.  The appeal decision, issued by MCC Associate Superintendent Michele Wood on June 19, 2019, does not identify the reason the infraction was dismissed, and there is no indication the appeal decision was provided to Ms. Stemler.  (*See* Dkt. 14, Ex. 1.)  Moreover, Ms. Stemler appears to indicate in her declaration in support of her summary judgment motion, which she executed in December 2019, that she did not learn of the inapplicability of the WACs to grievances until *after* she wrote the second infraction in July 2019. (*See* Dkt. 13, ¶ 7.)  Plaintiff offers no evidence of his own to rebut this assertion.

There is simply no evidence in the record demonstrating that Ms. Stemler, in writing the infraction against plaintiff in May 2019, was driven by evil motive or intent, or that her conduct was oppressive or involved reckless or callous indifference to plaintiff's constitutional rights.  It was simply a mistake which was subsequently rectified through the grievance appeal process.  In this Court's view, plaintiff has not demonstrated any entitlement to punitive damages arising out

REPORT AND RECOMMENDATION
PAGE - 21

of the conduct of Ms. Stemler. Plaintiff is, at most, entitled to an award of nominal damages based on the violation of his First Amendment rights.

CONCLUSION

Based on the foregoing, this Court recommends that plaintiff's motion for summary judgment be granted with respect to his retaliation claim and denied with respect to his freedom of speech and right to petition for redress of grievances claims. This Court further recommends that defendant's cross-motion for summary judgment be granted with respect to plaintiff's freedom of speech and right to petition for redress of grievances claims and denied with respect to his retaliation claim. Finally, this Court recommends that plaintiff's complaint and this action be dismissed with prejudice as to his freedom of speech and right to petition for redress of grievances claims, and that he be awarded nominal damages only with respect to his retaliation claim. A proposed order accompanies this Report and Recommendation.

OBJECTIONS

Objections to this Report and Recommendation, if any, should be filed with the Clerk within **twenty-one (21) days** of the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect the right to appeal. Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed. If no timely objections are filed, the matter will be ready for consideration by the District Judge on **May 8, 2020**.

DATED this 16th day of April, 2020.

Mary Alice Theiler
United States Magistrate Judge

REPORT AND RECOMMENDATION
PAGE - 22